[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This dissolution of marriage action seeks the termination of the parties' fifteen-year marriage. The classic high conflict, over litigated family matter was commenced by complaint dated December 31, 2000, and filed with the court January 17, 2001.
The parties, represented by counsel, appeared at trial on June 27, 2002, August 13, 2002, August 22, 2002, October 16, 2002, and November 21, 2002.[1] The court heard evidence from seventeen witnesses, several testifying more than once, and received into evidence thirty-three exhibits offered by the plaintiff and thirteen offered by the defendant. The minor child was represented by a court appointed guardian ad litem who was present at the trial. The parties were given time to file post-trial briefs; only the plaintiff did so on December 10, 2002. All of the evidence was considered by the court, as were the provisions of General Statutes §§ 46b-56, 46b-56a, 46b-56c, 46b-81, 46b-82, 46b-84, and 46b-215a, as well as the provisions of the Child Support Guidelines.
 FINDINGS OF FACT
The parties met in 1981 and after a five-year engagement married on September 19, 1987, in New London, Connecticut, the first marriage for both parties. They have one minor child born of the marriage, Tyler McDonough, born November 11, 1994. Of the two, the plaintiff has always been the main wage earner, starting with their return from their honeymoon when the defendant informed the plaintiff that he had quit his job prior to the wedding. Although her only education at the time was high school, she managed to procure excellent jobs and at one point was a vice president of a financial institution with a substantial salary. She has been employed full-time consistently throughout the marriage and at certain times even worked a part-time job in order to meet the parties' financial obligations and goals. The defendant, on the other hand, also a high school graduate with some higher education in a community college, mostly worked part time during the marriage and dabbled in the buying and CT Page 1759 selling of coins.
A few years into the marriage, the parties decided to purchase a home and rented a condominium with an option to buy. Both parties were working at the time and the expenses were split 50/50. They eventually bought a house in 1992 which was partially unfinished. The money used to purchase the home came from savings and some came from the plaintiff's parents. The upper portion of the house was not completed and because of this the parties were able to obtain the property for an affordable price with the idea that they would complete the work themselves. They in fact completed the upstairs portion of the house by using various credit cards to finance the renovations and home improvements.
Their son, Tyler, at this time was in full-time day care which the plaintiff paid for out of her income. The defendant did not assist in any of the chores necessary for the caring of Tyler as he believed "that was a woman's job." The relationship became strained to the point where there were several physical altercations, one in which the plaintiff was hit with a telephone and on another occasion was hit with a frying pan. There was no intimacy in the marriage of any kind. When the plaintiff inquired as to why this was, she was told that if she stopped being difficult, maybe he would reconsider.
In 2000, there was a criminal investigation for embezzlement at the credit corporation where the plaintiff was the vice president and accounting manager.[2] She was under tremendous strain and pressure during this time and began to see a therapist. After several months of counseling, the plaintiff decided her marriage was unhealthy and in September 2000, she consulted an attorney for the purpose of filing for divorce. She waited until after the holidays to have the defendant served and did not inform him of her intentions because she was afraid of what he might do given his past violent behaviors.
The plaintiff began a personal relationship with the state trooper, Darrin Magro, who headed the criminal investigation at her work in February 2001. There is no credible evidence indicating that this relationship began any time before the filing of the divorce action or was the cause of the breakdown of the marriage. That relationship has flourished and the plaintiff and Tyler reside with Magro in his home in North Haven. She pays rent to Magro and pays her proportionate share of the expenses related to the home.
All evidence directly portrays a woman who was a hard working and devoted wife and mother, completely invested in making a home for herself, her husband and her child. She possessed business acumen which CT Page 1760 the defendant clearly did not and managed the household and her career with relatively little to no help from her husband. Although the defendant favors the "traditional" roles that a woman is responsible for childcare and household tasks, there was no evidence that he accepted the flip side, that the man is the wage earner, protector and provider.
The defendant has been employed by the Mashantucket Pequot Tribe at Foxwoods Casino since 1993. Although supposedly a full time employee since 1994, he has not worked a full forty hours per week in the last three years. He attributes this to being required to "give away time" because the casino "over hired" dealers. Hope Domingo, casino administrator, whose duties include overseeing the scheduling department, denied there ever was an over abundance of dealers. The employees are, however, permitted to switch shifts amongst themselves which the defendant has done on numerous occasions. As a result, his salary presented on his financial affidavit does not correctly reflect his earning capacity for full-time employment.
He also claims to suffer from tendonitis in his right arm which prevents him from working a full forty-hour week in his current position as a dealer, but he presented no medical or credible evidence that he suffers from such an ailment. The plaintiff also claims he was unable to work after he was served with the dissolution complaint and was in "shock" over the "horrors" the plaintiff did to him. Although the court concedes the defendant experienced emotional pain from being served with the divorce complaint, his work records do not reflect he decreased his hours immediately after being served. (Plaintiff's Exhs. 28 and 29.) There was no evidence that the defendant sought the assistance of a therapist or doctor. Both assertions conflict with his testimony that full-time work is not available because of the claimed "over-hiring." The court finds his testimony regarding his employment to be wholly not credible and almost to the point in which he is attempting to deceive the court. The court finds the defendant has voluntarily been underemployed to avoid his child support obligation and to attempt to create alimony entitlement.
The divorce action had a very tumultuous beginning and has never gotten any better. Once the action was filed, the plaintiff moved out of the marital residence and then pursuant to court orders, the defendant was to vacate the residence and turn over the keys to the plaintiff. He did not do so, and the plaintiff was forced to have all of the locks replaced so that she could gain access to the property. When she finally did gain access to the property, she discovered that the defendant had failed to clean the house in the two months he had lived there alone, leaving over two months of newspapers in the living room, urine and feces in all three CT Page 1761 of the household toilets, and dishes with food over them in the kitchen, to list the most egregious acts. The entire home had to be cleaned by a professional cleaning service.
She also discovered that the defendant had removed all of the pictures and video tapes of Tyler. So in an effort to get back at the defendant, she removed his coin collection which was kept in a red steel locked box and kept it in the trunk of her car. With court intervention, the parties agreed to exchange the pictures and the locked box, which took place with the assistance of the plaintiff's father. Although the defendant claims that the plaintiff removed some of the coins from the box, there is no credible evidence to indicate that the plaintiff had access to a key or the box was ever tampered with. The court did not believe the defendant's claim that any coins were in fact taken and therefore no orders shall enter regarding reimbursement or return for alleged "missing" coins.
The defendant also claims that he should be reimbursed $8,750.00 for personal jewelry which he allegedly owned prior to the marriage that was stolen from the marital home. A claim was made to the parties' insurance carrier which claim was paid. Both parties put the money from the insurance claim into the household and into the stream of the family finances. Their identity as premarital assets, if they were ever that, was lost.
The defendant also requests the court to compensate him $12,000.00 for the purchase of various household items which were allegedly purchased with money that the defendant allegedly received by selling coins that his father allegedly left to him when his father died. However, there was conflicting testimony whether the coins were left to the defendant as part of his father's estate or given to the defendant prior to his father's death. There was no evidence of the defendant ever receiving the coins, no evidence of their sale, and no evidence of any purchase of household items with this money. The court declines to enter any orders regarding either of these claims.
Currently the parties have joint legal custody of the minor child, Tyler, with primary residence with the plaintiff in Hamden, Connecticut. The defendant has visitation with Tyler every weekend and he picks Tyler up from day care on Friday and drops him off on Sunday at the home of the maternal grandparents. This visitation has not been problem-free. There were two particular incidents which the court found particularly troublesome, one involving Tyler attending a birthday party, and another involving a July 4 celebration.
Tyler wanted to attend his friend's birthday party which was to be held CT Page 1762 on a Friday night. The plaintiff sent the defendant a copy of the invitation indicating that the defendant could pick up Tyler for his visitation in Branford at a sports center where the birthday party was going to be held. The defendant contacted the Branford police department to have Tyler escorted by the police from the birthday party in order to have the visitation with the defendant. He does not understand the impact this action might have on his son.
The second incident involved the visitation around the Fourth of July. The plaintiff's family has a traditional family outing at Lake George which Tyler has attended and has enjoyed. In July 2001, however, the defendant withheld Tyler from the plaintiff in violation of the court's pendente lite orders and did not let her or any member of her family know where Tyler was during this time period. As a result, Tyler missed this family outing, the defendant was found in contempt of court and sanctioned. Another example of the defendant's inability to separate his own needs from Tyler's best interests was when the defendant refused to let Tyler attend his baseball award dinner, where he was going to receive a trophy, because it conflicted with the defendant's visitation. The guardian ad litem was asked to intervene by the plaintiff, and the defendant allowed Tyler to attend.
One of the major issues concerning visitation is the defendant's request that he have visitation with his son every weekend and emphatically states that Tyler wants to be with him every single weekend. During this part of his testimony, the defendant showed much emotion, and the court in no way doubts his true love and affection for his son. However, he is unable to put the needs of his son ahead of his own selfish needs. As well as requesting visitation every weekend, the defendant is asking that neither party be allowed to have the Fourth of July as one of their vacation weeks. Although his family tradition for Christmas has been a Christmas Eve celebration, by his own admission, and the plaintiff's family tradition has always been to celebrate on Christmas Day, the defendant requested that he have his visitation with Tyler for Christmas Day for 2002. The court can only draw the conclusion that the defendant's sole purpose is to punish the plaintiff by sabotaging the plaintiff's family celebrations, and unfortunately, deprive Tyler of both parties' family traditions.
The court acknowledges the Custody Evaluation Report, which recommends the parties continue with joint legal custody. (Plaintiff's Exh. 1.) The court declines to follow all the recommendations contained in the report and shall enter its orders based upon all the evidence presented.[3]Yontef v. Yontef, 185 Conn. 275, 281, 440 A.2d 899 (1981). CT Page 1763
The court concludes the defendant does not have the ability to separate his own needs and anger from the best interests of Tyler. Therefore, the parties are unable to cooperate at any level sufficient to enable joint custody to work in the best interests of the child.
The case took far too long to try than was warranted by the assets involved. The court ascribes the length of the trial to the palpable hostility of the defendant toward the plaintiff. He is so obsessed with making the plaintiff the bad person and punishing her and showing himself as the person who was wronged that he appears incapable of reaching any practical resolution.
 ADDITIONAL FINDINGS AND ORDERS
The court makes the additional findings and enters the following orders:
JURISDICTION: The court has jurisdiction and the matter has been pending for 90 days. The allegations of the complaint are proved and true, including the allegation that the marriage has broken down irretrievably. A decree of dissolution may enter.
CUSTODY AND VISITATION: The plaintiff shall have sole legal custody of Tyler McDonough, born November 11, 1994, with primary residence with the plaintiff The defendant shall have reasonable parental access rights in accordance with the following access and parenting schedule:
 1. Weekends: Except as otherwise noted, every weekend, running from Friday, at 3:30 p.m., and in no event later than 5:30 p.m., with the defendant to pick up the child from school or daycare to Sunday at 10:30 a.m., except as noted otherwise. Sunday drop-off by the defendant shall be at the home of the child's maternal grandparents.
 2. On the weekends starting on the first Friday of every month, the plaintiff shall have the child for the full weekend. The plaintiff shall also have the full weekend on the weekend following the defendant's weeks of summer vacation.
3. Holidays:
 Christmas: Christmas Eve shall be defined as 10:00 a.m. on December 24 to 10:00 p.m. on December 24. The parties shall alternate Christmas Eves, with the defendant to have Christmas Eve in the odd years. The plaintiff shall have Christmas Eve in the even years and can pick up the child from daycare and drop off the child at the maternal CT Page 1764 grandparents. If Christmas Eve falls on a weekend, then pick up shall be at the maternal grandparent's home.
 Christmas Day: Christmas Day shall be defined as 10:00 p.m. on December 24 to 7:00 p.m. on December 25. The parties shall alternate Christmas Days, the plaintiff having the odd numbered years with the defendant to have the even numbered years. The child will be picked up by the defendant at the maternal grandparents' home and dropped off at the maternal grandparents' home.
 Thanksgiving: The parties shall alternate the Thanksgiving Day holiday, with the plaintiff to have the child on odd years and the defendant to have the child on even years from 5:00 p.m. at daycare on the Wednesday before Thanksgiving to the Sunday following Thanksgiving at 10:30 a.m., with the child to be dropped off at the maternal grandparents' home. On odd years, the plaintiff shall have the child for the entire Thanksgiving weekend.
 Easter: Alternating Easters, with the plaintiff to have the child on the odd numbered years, with the child to be dropped off at the maternal grandparents' home on the Saturday before Easter at 5:00 p.m. and the defendant to have the child on the even numbered years, with a return to the maternal grandparents' home by Sunday at 5:00 p.m.
 Mother's Day and Father's Day: These holidays shall be spent with the respective parents. For Mother's Day, the defendant shall have his regular pick up schedule for the weekend, commencing with the day care pickup on Friday and shall drop off the child at the maternal grandparents' home on the Saturday before Mother's Day at 5:00 p.m. For Father's Day, the defendant shall return to the child to the maternal grandparents' home by Sunday at 5:00 p.m.
 Friday holidays: The defendant shall have the child for every Friday holiday, excepting if such Friday falls on Christmas, in which case the Christmas visitation supersedes the Friday holiday visitation, to pick up the child from daycare by 9:30 a.m. and to return the child by 10:30 a.m. on Sunday at the maternal grandparents. The defendant shall have the option of picking up the minor child on Thursday afternoon or Friday morning at daycare. The defendant shall advise the plaintiff as soon as he has his work schedule whether he will pick up the child on Thursday or Friday morning.
 Memorial Day and Labor Day: These holidays shall be alternated between the parties. The defendant shall have the Memorial Day in odd years and Labor Day in even years, and the child shall be returned to the CT Page 1765 maternal grandparents' home no later than 5:00 p.m. on Monday. The defendant shall advise the plaintiff one week prior to the holiday if he will not have a scheduled Monday holiday off from work.
4. Each party shall have two non-consecutive weeks of summer vacation, when the child is on summer vacation, with the child each year. The week shall commence on Friday by 5:30 p.m. to Friday by 5:30 p.m. Pick up for the defendant shall be from daycare and return shall be by the defendant to the maternal grandparents' home. The plaintiff shall have the week of July 4 every year for the family Lake George outing, which vacation shall start on the Friday immediately preceding the Fourth of July. The Fourth of July 2003, falls on a Friday, for example, the plaintiff's Fourth of July visitation in 2003 will run from June 27, 2003, to July 4, 2003 at 5:30 p.m. The defendant shall pick up the child at that time at the maternal grandparents' home.
5. In consideration of the plaintiff having the week of July 4 every year, the defendant shall have the choice of summer vacation weeks every year, and shall advise the plaintiff in writing, by February 1 of each year of his chosen weeks, such weeks shall not be the first Friday of any month. The plaintiff shall notify the defendant of her second chosen week by March 1 of each year.
6. The parties shall alternate the child's school breaks as follows, if they have the vacation time from their work:
 In even years, the defendant shall have the February/winter break and the plaintiff shall have the April/spring break. In odd years, it shall reverse.
 If there is only one break yearly, the defendant shall have even years and the plaintiff shall have odd years.
 If the parties do not have vacation time available for those weeks, the regular access schedule shall remain in effect.
7. For the parties' and the child's respective birthdays, there shall be no visitation schedule and the child's and parents' regularly scheduled visitation shall control.
8. Child's activities during parenting: Each parent shall be responsible, when the child is with him or her, to ensure that the child attends all social obligations (such as birthday parties) and all school and extra-curricular activities and athletic obligations. CT Page 1766
9. Both parents shall keep the other parent informed as to their address and telephone numbers, including home and/or cellular telephone numbers, where the other parent may be contacted at all times.
10. Traveling information: Both parents shall inform the other, in writing, or any travel plans involving the child being removed from the State of Connecticut for more than one overnight, including dates of travel, an address where the child will be staying and a telephone number where the child can be reached.
11. Notwithstanding the above-referenced schedule, all referenced weekends may be split or the schedule otherwise altered by mutual agreement to meet the best interests of all parties.
12. The parties shall use their best efforts to adjust the visitation schedule upon reasonable request and notice from the other party, keeping in mind the best interests of the children.
13. The plaintiff shall advise the defendant of all major decisions affecting Tyler's health, education and upbringing, including school, athletic activities, and extracurricular activities in which Tyler participates.
CHILD SUPPORT: In calculating the amount to award in child support, the court is making the following additional findings regarding the earning capacity of the defendant.
The defendant is scheduled to work 40 hours per week and has always been scheduled to work 40 hours per week by his employer. (Testimony of Hope Domingo.) The defendant from the period of 1/6/01 to 9/7/02 has worked on an average 24.76 hours per week. (Plaintiff's Exhs. 28 and 29.) His pay is based upon an hourly compensation plus what is called a "toke" compensation which is an amount which varies depending upon the tips received by the casino employees in a given period. Currently, the defendant's pay is $6.46 per hour for regular pay and an average toke rate of $13.74 which, given a 40-hour work week equals a weekly gross salary of $807.60. The defendant testified that if he worked a 40-hour week his gross earnings would be $850.00 per week with a net of $629.00. In addition the defendant received a gross bonus of $1,350.00 which, assuming the same effective tax rate of 26 percent would equal an additional $19.00 per week for a total net weekly salary of $648.00 which the court finds is his weekly net earning capacity. It is equitable and appropriate to consider his earning capacity in making its orders regarding child support. Hart v. Hart, 19 Conn. App. 91, 94-95,561 A.2d 151 (1989). CT Page 1767
The defendant claims that the court should enter a deviation because of the plaintiff's live-in boyfriend's contribution to the household. The Child Support Guidelines require a deviation in the amount of child support ordered due to "regularly recurring contributions or gifts of a spouse or domestic partner, but only if it is found that the parent has reduced his or her income or has experienced an extraordinary reduction of his or her living expenses as a direct result of such contributions or gifts." The only evidence of the plaintiff's live-in boyfriend contribution or "gift" was he allowed her to use his General Motors credit for the purchase of the vehicle registered in Magro's name, but claimed by the plaintiff as her asset which amounted to a credit off the price of the vehicle of $300.00. There is no evidence or testimony of any other basis for which the defendant can claim a deviation based upon the plaintiff residing with her boyfriend.
The defendant also claims that the court should enter a deviation to reflect the additional travel time that he must drive to pick up his son for his court ordered visitation. Although the plaintiff did relocate during the pendency of this action to North Haven, Connecticut, the defendant then moved to Rhode Island, placing him further from not only his son but also his employment.
The court declines to find a deviation from the guidelines and orders the defendant to pay child support in the weekly amount of $123.00 in accordance with the Child Support Guidelines. The parties shall share child care expenses, 60 percent by the plaintiff and 40 percent by the defendant and unreimbursed medical costs, including dental, orthodontic, ophthalmologic, optometrist, eyeglass, psychiatric, psychological and counseling by the same percentages, after the plaintiff pays the first $100.00 in any calendar year.
This order shall be by way of an immediate wage execution pursuant to General Statutes § 52-362.
ALIMONY: Neither party shall pay alimony to the other.
PROPERTY DIVISION: The parties attempted to reach a pendente lite agreement regarding the distribution of the proceeds from the sale of the family marital residence and entered into a stipulation of February 2, 2001, which the court entered as orders of the court. When the parties could not reach an agreement at the closing for the distribution of the proceeds in accordance with that stipulation, they entered into a new agreement, holding the funds in escrow and reserving the issue of the distribution of the escrow to this court. (Plaintiff's Exh. 20.) CT Page 1768 Notwithstanding this, the defendant asked the court pendente lite to distribute the funds prior to the final dissolution hearing. This request was denied, the court finding the escrow agreement was binding. (Scarpellino, J.)[4] The defendant claims that although the escrow agreement states the parties' desire to amend and modify the terms of the pendente lite stipulation,[5] this court should disregard the escrow agreement and rely on the prior agreement of February 2, 2001, because that was a property distribution and property distributions are non-modifiable, pursuant to General Statutes § 46b-81.
The division of the proceeds in the February 2, 2001 stipulation provided for each party to receive one-half of the proceeds, less the mortgage balance and any credit card debt that is proven to be associated with the improvement of the property (with the balance credit card as of December 28, 2000). The stipulation goes further and states: "If the parties cannot agree as to sales price and procedure, the court shall retain jurisdiction on this issue." (Defendant's Exh. 3.)
General Statutes § 46b-81 provides, "At the time of entering adecree annulling or dissolving a marriage . . . the superior court may assign to either the husband or wife all or any part of the estate of the other, or may order the sale of such real property . . ." (Emphasis added.) The court finds that the escrow agreement dated June 15, 2001 (Plaintiff's Exh. 20), signed by the parties is fair and reasonable and approves the agreement pursuant to General Statutes § 46b-66. The court will divide the net proceeds of the sale in accordance with the provisions of General Statutes § 46b-81 and the agreement of the parties.
The court retains jurisdiction over the distribution of the marital estate, including the proceeds from the sale of the marital home presently held in escrow. The court finds that the plaintiff made more of a contribution to the acquisition and preservation of the house and also that the court finds her testimony credible with regard to the Citibank credit card debts resulting from the improvements to the house. The proceeds from the sale of the marital residence at 511 Boston Post Road, Waterford, Connecticut, in the approximate amount of $50,000.00 shall be divided 60 percent to the plaintiff and 40 percent to the defendant after payment of the Citibank credit card with the balance as of December 30, 2000, in the amount of $10,642.16.
PENSION: Each party shall retain any pensions, retirement accounts, 401K plan funds, IRA accounts, as shown on their respective financial affidavits. CT Page 1769
HEALTH INSURANCE: The defendant shall continue to provide health insurance, as available through his employer, for the minor child. In the event that such health insurance is no longer available, then the defendant shall provide alternate health insurance, if available at the same or no additional cost. In the event that such health insurance is not available at the same or no additional cost, and the health insurance is available to the plaintiff through her employer at no cost, then the plaintiff shall provide such health insurance. In the event that the health insurance for the minor child is available to the plaintiff, but at a cost, then so long as that insurance is available at the same cost as the prior coverage through the defendant's employer, the defendant shall pay such additional premiums. In the event that the premiums for any coverage through the plaintiff's employer are in excess of the premiums for coverage that was previously provided through the defendant's employer, then the parties shall share equally the amount in excess of the previous premiums.
Any unreimbursed expenses shall be paid as ordered above.
TAXES: The plaintiff shall be entitled to claim the minor child as a dependency exemption on her income tax returns.
BANK ACCOUNTS and VEHICLES and OTHER ASSETS: The parties shall retain their own bank accounts and shall retain their own vehicles as listed on their respective financial affidavits. The defendant shall retain his coin collection free and clear of any and all claims by the plaintiff.
LIABILITIES AND DEBTS: The plaintiff made sufficient showing that the Citibank was for the improvements to the house. There was no agreement with respect to the other credit cards and the court is satisfied that the Bank of America credit card is personal to the plaintiff and the Bank One card is personal to the defendant and shall be their respective sole responsibility. The other credit cards, namely First Card, Sears, and J.C. Penney, are joint household debts and each party shall be responsible for one-half. The escrow agent shall disburse the amounts to pay these three credit card debts in the amounts as set forth below. The balances are of December 30, 2000. The defendant shall reimburse the plaintiff in the amount of $2,478.00, which amount represents one-half of the amount of payments made by the plaintiff on these debts since the balance date.
The defendant shall reimburse the plaintiff in the amount of $2,108.21 for the costs incurred by the plaintiff in changing the locks on her car, including the ignition, the locks on the house, the cleaning of the house and the oil used by the defendant during the time that he was in CT Page 1770 sole possession of the house and the January mortgage payment, also to be paid out of the defendant's share of the net proceeds from the funds held in escrow.
The parties shall be responsible for all of the other liabilities and debts listed on their respective financial affidavits, except as herein set forth.
The parties shall each indemnify and hold each other harmless of these debts.
FACILITATION OF CO-PARENTING: Neither party shall do or say anything, or suffer or allow any person to do or say anything that in any way disparages or denigrates the other party to the child.
ESCROW AGENT: The escrow agent is to disburse the proceeds in accordance with the court's orders, with the checks to be made payable as follows:
1. Carlene McDonough $15,737.04
2. Kevin McDonough $3,279.26
3. Citibank $10,642.16
4. First Card $3,226.36
5. Sears $3,943.98
6. J.C. Penney $1,557.49
7. Carlene McDonough $2,478.00
8. Carlene McDonough $2,108.21
9. Atty. Lori Hellum $7,027.50
EDUCATION: The defendant is ordered to pay one-half of the child's college education.
ATTORNEYS FEES: The parties shall be each responsible for their own attorneys fees. The parties shall be responsible, each, for one-half of the fees of the guardian ad litem, Lori Hellum, and her fees shall be paid from each of the party's share of the funds held in escrow. CT Page 1771
Orders shall enter in accordance with the foregoing.
Swienton, J.